

# SUPREME COURT OF MISSOURI
## en banc

*Opinion issued March 4, 2025*

IN RE: PAUL ERIC PETRUSKA, )
) No. SC100727
Respondent. )

### ORIGINAL DISCIPLINARY PROCEEDING

The Office of Chief Disciplinary Counsel ("OCDC") alleged Paul Eric Petruska violated the Rules of Professional Conduct. After an evidentiary hearing, the disciplinary hearing panel recommended Petruska be suspended indefinitely with no leave to apply for reinstatement for three years. The panel further recommended the Court stay the suspension and place Petruska on probation for three years. Petruska accepted the panel's recommendation, but OCDC rejected it. OCDC contends Petruska is ineligible for probation under Rule 5.175(a)(3) because he has committed acts that, absent mitigating factors, would warrant disbarment. This Court agrees. Following a *de novo* review of the record, this Court finds Petruska violated Rules 4-1.2(a), 4-1.3, 4-1.4, 4-3.3, and 4-8.4(c). After considering mitigating and aggravating factors, this Court finds suspension with no leave to apply for reinstatement for three years is the appropriate discipline.

### Procedural History

In June 2023, OCDC determined probable cause existed that Petruska was guilty of professional misconduct. OCDC prepared an information alleging Petruska violated five

separate rules of professional conduct in his handling of a single case. Petruska filed an answer to the information. A hearing occurred in March 2024 before the panel.

The panel issued its decision in June 2024. It unanimously recommended Petruska be suspended indefinitely with no leave to apply for reinstatement for three years, but it found the suspension should be stayed with Petruska placed on probation for the same term. The panel set forth probationary terms and conditions. Petruska accepted the panel's decision. OCDC rejected the decision, and, as a consequence, the matter was set for briefing and argument before this Court. *See* Rule 5.16(n); Rule 5.19(b).

## Standard of Review

"This Court has inherent authority to regulate the practice of law and administer attorney discipline." *In re Prewitt*, 660 S.W.3d 1, 3 (Mo. banc 2023) (internal quotation omitted). The findings and the recommendation of the panel are not binding on this Court, and this Court conducts *de novo* review of all evidence. *Id.* In this review, violations of the rules of professional conduct must be established by a preponderance of the evidence to permit discipline. *Id.*

## Findings of Fact and Conclusions of Law

Petruska was admitted to practice law in Missouri in September 1995. His license is currently in good standing, and he has no previous disciplinary history. In December 2013, Petruska was hired as a chief trial attorney for Zurich Insurance Company, doing business as the Law Office of Craig A. Hansen. The law office would defend Zurich's insureds who were sued for claims covered by their insurance policies. As a chief trial attorney, Petruska mostly handled large, catastrophic injury claims. Petruska worked with

2

litigation specialists or adjusters in the Zurich claims department. Those claim professionals would normally control the final decision for settling a case.

In July 2018, Petruska was assigned a case to represent Zurich and its insured, an automobile dealership. An automobile dealership employee was involved in a serious automobile accident with a mother and her daughter. The injured parties ("plaintiffs") sued the automobile dealership and the employee ("defendants"). The Zurich adjuster supervising the case was an individual with whom Petruska had previously worked, and Petruska found it difficult to work with this particular adjuster. Petruska and the adjuster would clash over the settlement value of cases.

As the parties proceeded with depositions in the automobile accident case, Petruska had difficulty locating the dealership's now-former employee. Petruska hired a private investigator to locate the former employee. Although the former employee initially appeared cooperative, he repeatedly failed to appear for scheduled depositions. The plaintiffs sought sanctions, and, in early October 2019, the circuit court entered an order awarding attorney fees for the time spent filing the motion for sanctions, costs associated with all prior depositions, and the cost of the deposition of the former employee, which was to occur within one week. If the former employee failed to appear again, the court ordered the former employee's affirmative defenses would be struck and he would be barred from testifying in the case. Petruska did not inform Zurich's claims department or the defendants that the plaintiffs had filed a motion for sanctions or that the circuit court had entered an order for sanctions.

3

During discovery, plaintiffs produced a medical report that recommended surgery for one of the plaintiffs. The plaintiffs' attorney deposed the physician, who testified consistently with the report. Petruska believed this assessment would likely increase the potential damage and resulting exposure for the insured. In June 2019, the adjuster asked Petruska to obtain an expert to counter the plaintiffs' expert to reduce the plaintiffs' expectations and force settlement. The adjuster repeated this request in July 2019 and December 2019.

At some point near the end of October 2019, with a trial scheduled to begin in the middle of the next month, Petruska met with plaintiffs' counsel to discuss the cost for resolving the case. It became apparent the plaintiffs would be willing to accept $120,000 to settle the case.

On November 1, 2019, Petruska e-mailed plaintiffs' counsel informing her explicitly: "*I have authority to offer $120,000, and I am offering it. At the same time, I am trying to get a little more. One way or the other, I will be finished on Monday haggling with claims.*" (Emphasis added). On November 6, Petruska followed up that he "was unable to get more" but stated "I have the $120,000 we discussed." He inquired whether this was acceptable. The plaintiffs accepted the settlement terms on the condition the defendants paid costs, including the fees and costs awarded in the sanction order. Petruska drafted a settlement agreement and release for each plaintiff, and the plaintiffs executed those agreements. Petruska admits neither the adjuster nor the claims department gave him sufficient authority to settle the lawsuit. The defendants likewise did not give him the authority to settle the lawsuit.

4

On November 7, 2019, the circuit court entered an order stating, "This cause is passed for settlement[.]" Petruska drafted the order. On December 19, the plaintiffs filed a motion to enforce the settlement agreement. By agreement before the court the next day, the defendants were granted until January 10, 2020, to pay the settlement funds and other agreed fees. Petruska and plaintiffs' counsel signed the order, which the court entered. On January 10, the settlement funds were still not paid. The court ordered the defendants to pay the settlement by January 24 and further ordered, if the funds were not paid by that deadline, post-judgment interest would be included in the settlement to run from the original settlement date. Petruska and plaintiffs' counsel again signed the order. In each instance, the circuit court had no reason to believe Petruska lacked authority to settle the case. Petruska did not notify Zurich or the defendants of the purported settlement during this time.

Plaintiffs' counsel repeatedly requested payment of the settlement, and Petruska responded with lies and delay. On December 18, 2019, Petruska e-mailed plaintiffs' counsel to inquire whether the settlement check had arrived. After being told it had not, Petruska responded with potential reasons why the check may not have reached its destination. He requested plaintiffs' counsel provide an updated Form W-9 and explained Zurich would not issue payment if there were any problems with the information on file. On December 23, Petruska told plaintiffs' counsel that "the check [was] considered issued and mailed by regular mail to your address." Petruska then claimed he had low confidence it would arrive and further suggested the holidays could cause delay in delivery. By December 27, plaintiffs' counsel informed Petruska the check still had not arrived, and

5

Petruska responded on December 30 that he was cancelling the check and requesting another. On January 20, 2020, Petruska e-mailed plaintiffs' counsel to inform her a new check was being issued. On January 24, Petruska again followed up claiming *he* "was getting the run around" in having Zurich issue the check. Petruska asked if the plaintiffs would accept an additional $2,500 on top of what was owed to permit additional time to resolve the matter. Of course, throughout this timeframe, no check was in existence because Zurich had not approved any settlement.

On January 29, Petruska confirmed, via e-mail, a check was sent for $2,185 to the law firm representing the plaintiffs. They apparently received this check. The payment was to cover the previously entered sanction. To process this check, Petruska had requested an invoice from plaintiffs' counsel "for something other than a sanction." Using an invoice listing "Expert Charge (reimbursement)," Petruska was able to have the claims department issue this check. The claims department did not know the true purpose of the payment. Petruska asserts he took this action because it was in the best interest of the former employee. He feared the adjuster would find a possible excuse to deny coverage because the former employee was not participating in his defense.

In a final attempt to obfuscate the fact the settlement funds did not exist, Petruska sent plaintiffs' counsel a FedEx envelope supposedly containing the settlement check. He used his personal FedEx account, as opposed to Zurich's account. Petruska provided a tracking number for the package on February 4. When plaintiffs' counsel received the package on February 5, the envelope was empty.

6

Around the same time plaintiffs' counsel was requesting payment of the settlement, Petruska continued to represent to the adjuster in Zurich's claims department that the lawsuit was ongoing. In early January 2020, Petruska discussed with the adjuster the possibility of obtaining a Zurich-approved doctor to review the medical file in the case (a request the adjuster had made the prior June). The adjuster authorized Petruska to obtain the doctor. Toward the end of the month, Petruska and the adjuster were continuing to discuss the case, as if Petruska had not settled. On January 22, Petruska sent the adjuster a lengthy e-mail discussing the value of the case. Petruska represented that he did not want the plaintiffs to increase the amount of money they believe the case should bring, and he "s[aw] that possibility occurring next week." The Zurich-approved doctor had recommended that surgery for the plaintiff could be beneficial. The e-mail further claimed the plaintiffs had finally obtained service on the former employee with a subpoena for a deposition. Petruska told the adjuster the plaintiffs had "developed better facts and better damages" and he believed plaintiffs would increase their demand.

On February 7, the plaintiffs filed an application for execution and motion for civil contempt against the defendants and noticed a hearing on the contempt motion for February 28. Petruska attempted to obtain the settlement funds in advance of that hearing. His first avenue was through the adjuster. On February 25, Petruska sent the adjuster an e-mail in a further attempt to provide objective evidence on the need to settle. Petruska outlined four different jury verdicts for similar incidents ranging from $250,000 to $3 million. On the same day, Petruska sent another e-mail to the adjuster explaining how he believed he could talk to another partner in the firm of plaintiffs' counsel in an attempt to resolve the mother's

7

case for less than $125,000 and the daughter's case for $15,000 or less. By the end of the day, the adjuster notified Petruska he had submitted his evaluation to his superiors and should hear back by the end of the week.

Next, Petruska attempted to secure the settlement funds from the automobile dealership. On February 26, Petruska e-mailed the president of the automobile dealership, attaching an "Advance and Reimbursement Agreement." The e-mail indicated Petruska "did not put the details in this agreement because it would make the agreement much longer than necessary." The agreement itself noted: "Due to a unique timing circumstance in the … lawsuit, Paul E. Petruska has asked [the automobile dealership] to advance a settlement in the lawsuit by drafting a check in the amount of $125,000 made payable to [plaintiffs and plaintiffs' counsel]." Independent counsel for the automobile dealership replied to Petruska's e-mail, seeking an explanation of the status of the case and questioning why Zurich had not paid. The response further notified Petruska the president of the automobile dealership would not sign the reimbursement agreement.

Around this same time, a Zurich supervising attorney reviewed Petruska's file for the case and discovered the motion to enforce the judgment. Petruska's direct supervisor investigated the matter and learned of the unauthorized settlement. Zurich advised Petruska to cease all work on the case. Zurich ultimately paid the settlement. On March 12, the plaintiffs filed a satisfaction of judgment and dismissed their cause of action with prejudice. Zurich paid the plaintiffs $125,000—$5,000 more than the original value of the settlement to compensate the plaintiffs for the difficulties and delays they encountered.

8

Zurich terminated Petruska in early March 2020. Petruska then opened his own law firm. At the time of the hearing before the panel, Petruska was working at UB Greensfelder.[1]

As OCDC alleged and Petruska admitted, this Court finds Petruska violated Rules 4-1.2(a), 4-1.3, 4-1.4, 4-3.3, and 4-8.4(c). The first three rule violations relate to the client-lawyer relationship. Pursuant to Rule 4-1.2(a), "[a] lawyer shall abide by a client's decisions concerning the objectives of representation … and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter." Petruska failed to follow this rule by settling the litigation without authority from his clients to do so. Rule 4-1.3 requires an attorney to "act with reasonable diligence and promptness in representing a client." At a minimum, Petruska violated this rule by failing to timely obtain the requested independent medical examination of the plaintiff. Petruska, by his own admission before the panel, testified he could not touch or look at the case for an extended period of time. Rule 4-1.4(a)(1) requires an attorney to "keep the client reasonably informed about the status of the matter[,]" and Rule 4-1.4(b) instructs an attorney to "explain a matter to the extent

---

[1] After OCDC filed the record in this Court, OCDC filed a motion to supplement the record with an additional exhibit. This Court sustained the motion. Petruska argues this Court erred in sustaining the motion without providing him an opportunity to respond. In this Court's *de novo* review of disciplinary cases, Rule 5.19(e) provides, "Further evidence is not permitted except upon this Court's request or upon motion granted." Although such rule would appear to permit consideration of the supplemental exhibit, this Court finds it unnecessary under the circumstances to consider further evidence offered against Petruska or address operation of Rule 5.19(e). The findings of facts and conclusions of law present in this opinion are premised on the record filed in this Court in August 2024.

reasonably necessary to permit the client to make informed decisions regarding the representation." By undertaking to settle this matter on his own accord and without the input of his clients, Petruska violated this rule. Petruska further violated the rule by failing to inform his clients of the circuit court's orders and the serious motions the plaintiffs filed.

Rule 4-3 involves an attorney's role as an advocate. Within that role, Rule 4-3.3 requires candor toward the tribunal. Rule 4-3.3(a)(1) specifically bars an attorney from knowingly "mak[ing] a false statement of fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." On the eve of trial, Petruska represented to the court the cause should be passed for settlement. Petruska then appeared before the circuit court at hearings related to payment of the purported settlement and drafted or signed respective orders related to payment of the settlement. By doing so, Petruska represented to the court the case had settled and payment was forthcoming. This was untrue.

Rule 4-8.4(c) states an attorney commits professional misconduct by "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation." Petruska violated this rule in multiple respects. He falsely told plaintiffs' counsel he had the authority to settle the lawsuit. He provided unauthorized settlement agreements to the plaintiffs. He then misrepresented to the circuit court, several times, that the case was settled. He falsely strung along plaintiffs' counsel, repeatedly stating settlement funds were forthcoming and blaming Zurich for delays. This falsehood culminated in Petruska sending an empty envelope to plaintiffs' counsel in an attempt to continue the farce. At the same time Petruska was dishonest with the plaintiffs concerning payment of the settlement, Petruska

10

continued to misrepresent the status of the case to Zurich's adjuster. Petruska also, with the apparent assistance of plaintiffs' counsel, misrepresented the true reason for a payment from Zurich. The payment was to cover the cost of a sanction entered against the former employee, but Petruska submitted an invoice describing the cost as "Expert Charge (reimbursement)." Finally, Petruska attempted to obtain the settlement funds from the automobile dealership by misrepresenting that "a unique timing circumstance" necessitated the dealership advancing settlement funds that would be reimbursed by Zurich. At that point, Zurich had no knowledge of any settlement.

**Analysis of Appropriate Discipline**

Having determined Petruska violated the aforementioned rules, this Court must determine the appropriate discipline. "This Court disciplines attorneys for two purposes: (1) to safeguard the public and (2) to uphold the legal profession's integrity." *In re Hester*, 658 S.W.3d 517, 526 (Mo. banc 2022). Rule 5.17(a) provides five forms of discipline through which this Court can seek to accomplish these twin purposes. In imposing discipline, this Court considers (1) the ethical duty the attorney violated; (2) the attorney's mental state; (3) the extent of actual or potential injury resulting from the misconduct; and (4) aggravating and mitigating circumstances. *Hester*, 658 S.W.3d at 526; *see also* American Bar Association's Standards for Imposing Lawyer Sanctions 3.0 (1992) ("ABA Standards"). In cases involving numerous instances of professional misconduct, the discipline imposed should, at a minimum, reflect the appropriate sanction for the most serious misconduct committed. *Hester*, 658 S.W.3d at 526.

11

This Court considers its prior cases and the ABA Standards when determining discipline. *In re Neill*, 681 S.W.3d 194, 198 (Mo. banc 2024). The determinative issue in this case is the applicable ABA Standard for assessing the baseline sanction—the sanction before consideration of aggravating and mitigating circumstances. ABA Standard 6.1 lists the "sanctions [that] are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court." OCDC argues this Court should apply ABA Standard 6.11, which provides:

> Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

Petruska counters ABA Standard 6.12 is more appropriate. Under that standard:

> Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

Recognizing the appropriate ABA Standard under the circumstances is critical because, if disbarment is the baseline sanction, Petruska is not eligible for the probation he seeks. *See* Rule 5.175(a)(3) (establishing as an eligibility criterion for probation that an attorney "[h]as not committed acts that, absent mitigating factors, would warrant disbarment"); *Neill*, 681 S.W.3d at 199 (considering ineligibility for probation under a prior iteration of the rule because an attorney had committed "acts warranting disbarment").

Comparing the two standards, it is obvious they differ in two regards. First, the two standards diverge with respect to the attorney's mental state. ABA Standard 6.11 involves an *intent* to deceive the court and ABA Standard 6.12 involves *knowledge* of false submissions. Second, the standards differ with respect to the degree of harm. ABA Standard 6.11 involves *serious* or potentially *serious* injury or a *significant* or potentially *significant* adverse effect on the legal proceeding. ABA Standard 6.12 deals with injury or potential injury or an adverse or potentially adverse effect on the legal proceeding.

This Court agrees with OCDC that ABA Standard 6.11, which sets disbarment as the baseline sanction, applies. Petruska's mental state conforms with the concept of "intent" present in that standard. "Intent" is defined under the ABA Standards as "the conscious objective or purpose to accomplish a particular result." In representing the parties had settled, which his clients had not, Petruska acted with the purpose to have the circuit court remove the upcoming trial setting for the matter. His purpose was to end the litigation, even without his clients' agreement. He made further representations to the circuit court to maintain the status quo to enable him to gain settlement authorization from his clients. "Knowledge" is defined under the ABA Standards as "the conscious awareness of the nature or attendant circumstances of the conduct *but without the conscious objective or purpose to accomplish a particular result*." (Emphasis added). Petruska was seeking to accomplish a specific result, and ABA Standard 6.12 cannot apply. Moreover, this Court views Petruska's deception to have caused a potentially significant adverse effect on the legal proceeding. Zurich's internal review process, which flagged the case, appears to have prevented further adverse consequences. Petruska's false representation of the settlement

13

caused unnecessary delay and expense to the parties and unnecessary involvement of the court. Disbarment is the baseline sanction.[2]

Against the baseline sanction of disbarment, this Court next considers aggravating and mitigating factors, as it does in all cases in assessing the appropriate discipline. *In re Belz*, 258 S.W.3d 38, 42 (Mo. banc 2008). In mitigation, Petruska has no disciplinary record, *see* ABA Standard 9.32(a); cooperated throughout the disciplinary process, *see* ABA Standard 9.32(e); and expresses remorse for his actions, *see* ABA Standard 9.32(l). Petruska has demonstrated commendable involvement in his community. *See* ABA Standard 9.32(g). It is also relevant that the actions giving rise to the multiple violations involve a single underlying matter.

The panel determined Petruska lacked a personally dishonest or selfish motive. *See* ABA Standard 9.32(b) (listing "absence of a dishonest or selfish motive" as a factor in mitigation). OCDC recognizes the panel's assessment but contends Petruska admitted to a dishonest motive in his testimony. Petruska maintains his actions were dishonest but he had no dishonest or selfish motive. According to Petruska, he believed he was trying to rectify what he had done and limit the exposure to his clients and Zurich. While that may be partially true, the means by which Petruska attempted to accomplish this were certainly

---

[2] Although not advanced by OCDC, this Court also finds ABA Standard 5.11(b) applicable. That standard involves a failure to maintain personal integrity. As a baseline sanction "in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation," ABA Standard 5.11(b) states disbarment is generally appropriate when "a lawyer engages in any other intentional conduct [aside from those instances of criminal conduct referenced in ABA Standard 5.11(a)] involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." The overall scheme that resulted in Petruska's violation of Rule 4-8.4(c), outlined above, falls within this standard.

dishonest, and it is evident the underlying reason for much of his misconduct was to disguise the existence of the settlement from Zurich and delay plaintiffs' counsel until Zurich would agree to a number that had already been determined. This is a dishonest motive, and ABA Standard 9.32(b) should not apply. For similar reasons, this Court rejects Petruska's invocation of ABA Standard 9.32(d), which notes rectifying the consequences of misconduct is a factor in mitigation. Any attempt to rectify an initial act of misconduct through conduct that further violates the Rules of Professional Conduct will not be considered in mitigation.

This Court further rejects Petruska's suggestion that ABA Standard 9.32(k) should apply as a mitigating factor. ABA Standard 9.32(k) provides "imposition of other penalties or sanctions" is a factor that may be considered in mitigation. Petruska argues he lost employment at Zurich due to his misconduct and has been faced with subsequent financial hardship. This Court has recognized sanctions entered by a court fall within ABA Standard 9.32(k). *See In re Coe*, 903 S.W.2d 916, 918 (Mo. banc 1995). "The mitigating factor of 'the imposition of other penalties or sanctions' reflects an awareness that where another court has already imposed penalties or sanctions directly addressing the conduct at issue, some of what we seek to accomplish through our choice of sanction may already have been accomplished." *Att'y Grievance Comm'n of Maryland v. Whitted*, 319 A.3d 1116, 1137 (Md. 2024). But this Court agrees "the natural financial and reputational consequences of an attorney's misconduct suffered outside of any formal disciplinary or justice system" should not be considered under this standard. *Id.* This Court does not consider loss of

employment as a consequence of misconduct as a mitigating factor under ABA Standard 9.32(k).

Petruska also seeks mitigation pursuant to Rule 5.285. Rule 5.285(b) provides, in relevant part:

> A mental disorder … is not a defense to allegations of professional misconduct but may be considered as a mitigating factor in determining appropriate discipline. *Demonstration of management* of the mental disorder will be considered in determining whether to impose discipline less than that which would have been imposed upon a lawyer in similar circumstances where a mental disorder was not present, but does not in itself entitle the person to imposition of a lesser discipline.

(Emphasis added). Petruska was diagnosed with anxiety and attention-deficit/hyperactivity disorder. This Court finds credible that Petruska's diagnoses impacted his misconduct in this case. At the same time, the Court finds Petruska failed to sustain his burden showing he is managing his diagnoses. *See id*; Rule 5.285(e)(2). Petruska attended nine therapy sessions between March and September 2020. The independent evaluation conducted for the disciplinary proceeding recommended Petruska see a psychiatrist and a therapist on an ongoing basis to appropriately manage his diagnoses. Testimony before the panel indicated Petruska's willingness to attend therapy but further demonstrated Petruska had not actively sought therapy since September 2020, despite his own acknowledgment that the prior sessions were beneficial.

Aggravating factors are present in this case. As discussed previously, Petruska acted with a dishonest motive. *See* ABA Standard 9.22(b). A pattern of misconduct occurred over the course of months. *See* ABA Standard 9.22(c). Multiple offenses

occurred. *See* ABA Standard 9.22(d). Finally, Petruska had substantial experience in the practice of law. *See* ABA Standard 9.22(i).

After considering aggravating and mitigating factors, this Court finds a downward departure from the presumptive discipline of disbarment is warranted. The mitigating factors that are present outweigh those in aggravation. An indefinite suspension is the appropriate discipline.

Petruska argues precedent supports imposition of a stayed suspension with probation. Petruska specifically relies on *In re Krigel*, 480 S.W.3d 294 (Mo. banc 2016), and *In re Gardner*, 565 S.W.3d 670 (Mo. banc 2019). Although Petruska finds *Krigel* to be instructive precedent, especially because of its similar rule violations premised on a single case, this Court recently cautioned that "*Krigel* … was an anomaly and should not be relied upon as persuasive authority for determining the appropriate discipline in a professional misconduct proceeding." *In re Agron*, 701 S.W.3d 623, 632 (Mo. banc 2024).

*Gardner* also does not support a stayed suspension. In *Gardner*, this Court narrowly imposed a stayed suspension over an actual suspension. 565 S.W.3d at 680. The professional misconduct in *Gardner* involved an estate's personal representative taking a fee without court authorization and in violation of the court's specific order. *Id.* at 677. This Court found the attorney's misconduct to be "in part negligent and in part knowing" and found a suspension to be the presumptive discipline. *Id.* at 679. Considering mitigating factors, chief of which was a lack of a selfish or dishonest motive under the circumstances, this Court found a downward departure to a stayed suspension justified. *Id.* at 679-80. *Gardner* is inapposite for two primary reasons. First, the sanction of disbarment

17

was not the baseline discipline in *Gardner*, but it is here.  As *Gardner* recognized, under the ABA Standards, disbarment is usually reserved for intentional conduct, which was not present in that case.  *Id.* at 678-79.  Second, in *Gardner*, the attorney lacked a selfish or dishonest motive.  As discussed previously, this is not similar to the course of conduct here.

## Conclusion

For the foregoing reasons, Petruska is suspended indefinitely from the practice of law with no leave to apply for reinstatement for three years.

_____
Robin Ransom, Judge

Russell, C.J., Powell, Fischer,
Broniec and Gooch, JJ., concur;
Wilson, J., dissents in separate
opinion filed



# SUPREME COURT OF MISSOURI
## en banc

IN RE: PAUL ERIC PETRUSKA,      )
                                        )         No. SC100727
      Respondent.              )

## DISSENTING OPINION

The principal opinion suspends Petruska from the practice of law for an indefinite period with no leave to apply for reinstatement for three years. I concur with the principal opinion's findings of facts and its conclusions regarding Petruska's violations of the Rules of Professional Conduct. Petruska committed very serious violations of multiple rules, and a serious disciplinary sanction is warranted. In my view, however, the principal opinion imposes a sanction greater than that necessary to protect the public and the integrity of this profession. *In re Gardner*, 565 S.W.3d 670, 677 (Mo. banc 2019) (explaining the purpose of attorney disciplinary proceedings "is not to punish the attorney, but to protect the public and maintain the integrity of the legal profession" (quotation marks omitted)). I would permit Petruska to apply for reinstatement after one year; therefore, I respectfully dissent.

_____
Paul C. Wilson, Judge